OHIO ET AL. *v.* UNITED STATES ET AL.[*]

No. 868. Argued May 8, 1934.—Decided May 28, 1934.

[*] Together with No. 886, *United States et al.* v. *Ohio et al.*

*Mr. John W. Bricker,* Attorney General of Ohio, and *Messrs. Ernest S. Ballard, Clan Crawford,* and *H. Austin Hauxhurst,* with whom *Messrs. Donald C. Power, Atlee Pomerene,* and *Andrew P. Martin* were on the brief, for the State of Ohio et al., appellants in No. 868 and appellees in No. 886.

*Mr. J. Stanley Payne,* with whom *Solicitor General Biggs, Assistant Attorney General Stephens,* and *Messrs. Elmer B. Collins* and *Daniel W. Knowlton* were on the brief, for the United States and Interstate Commerce Commission, appellees in No. 868 and appellants in No. 886.

*Mr. August G. Gutheim* for the Western Pennsylvania Coal Traffic Bureau et al., appellees in No. 868 and appellants in No. 886.

*Mr. Alexander M. Bull,* with whom *Mr. Henry C. Hall* was on the brief, for Robert C. Hill et al., Receivers, appellees in No. 868 and appellants in No. 886.

*Mr. Guernsey Orcutt,* with whom *Messrs. M. Carter Hall, Leo P. Day, Charles R. Webber,* and *Frederic D. McKenney* were on the brief, for the Pennsylvania Railroad Co. et al., interveners.

MR. JUSTICE ROBERTS delivered the opinion of the Court.

These are appeals from orders of a statutory court of three judges, convened in the Southern District of Ohio, in two suits, one brought by the State of Ohio and the Public Utilities Commission of Ohio, and the other by the Wheeling and Lake Erie Railway Company, against the United States and the Interstate Commerce Commission, to enjoin and set aside two orders of the Commission. The suits were consolidated for trial. The first of the Commission's orders, that of May 2, 1933, required the increase of Ohio intrastate rates on bituminous coal from certain mining districts in eastern and southern Ohio to destinations in the northeastern portion of the State. The second order, that of May 9, 1933, required the rates prescribed by the first to be increased by the amount of the surcharge authorized upon interstate rates on bituminous coal in the Fifteen Per Cent Case, 1931, 178 I.C.C. 539, 179 I.C.C. 215, and 191 I.C.C. 361. While the causes were under submission the period during which the surcharge was authorized expired, and it was discontinued. The court, therefore, refrained from any adjudication as to the order of May 9, 1933, and no issue is here raised concerning it.

The court granted preliminary injunctions, but after a hearing on the merits, dissolved them and dismissed the bills. It, however, stayed the operation of the order of May 2, 1933, for a period of sixty days, so that the plaintiffs might perfect an appeal to this court. Upon the allowance of an appeal (No. 868) the defendants took a

cross-appeal (No. 886) assigning as error the entry of the stay order. By decree of February 12, 1934 (291 U.S. 644), the stay was vacated. The appeal in No. 886 will, therefore, be dismissed as moot.

The Commission's order of May 2, 1933, requiring the rates intrastate from points in southern and eastern Ohio to destinations in northeastern Ohio, on bituminous coal in carload lots, to conform to those in effect prior to June 30, 1932, was entered under § 13 (3) and (4) of the Interstate Commerce Act.[1] The Commission found that the reduced rates put into effect on the intrastate traffic in question as a result of orders or permission of the Public Utilities Commission of Ohio were unduly preferential of persons and localities in Ohio, unduly prejudicial to persons and localities without the State, and that they cast an undue revenue burden upon interstate commerce.

The appellants, conceding the Commission's power under § 13 (3) and (4) of the Act (*Florida* v. *United States,* 282 U.S. 194, 208; *United States* v. *Louisiana,* 290 U. S. 70; *Florida* v. *United States, ante,* p. 1), claim the dismissal of the bills was erroneous for these reasons: (1) The Commission did not afford them the full and fair hearing to which they are entitled by § 13 of the Act. (2) There is no evidence to support the finding that restoration of the state rates to their former level was required to avoid undue preference and prejudice between persons and localities. (3) The Commission exceeded its authority in requiring the state rates to be raised, without first having found reasonable, or made reasonable, all substantially competitive interstate rates to the same destinations.

The District Court held the order justified by reason of undue preference and prejudice, but did not pass upon the lawfulness of the Commission's action in respect of

---

[1] U.S.C. 49, c. 1, § 13 (3), (4).

revenue discrimination. We hold the decision of the court was right and we need not discuss the arguments presented as to revenue burden.

The litigation does not involve state-wide rates, but only those on bituminous coal in carloads from producing fields in Ohio to destinations in that portion of the State lying northwardly of a line drawn east and west through Columbus, and eastwardly of a line drawn north and south through Galion and Sandusky and Columbus. The latter territory is highly industrialized, and great quantities of coal are there consumed for manufacturing and domestic purposes. This comes from the producing districts in eastern Ohio and from those to the east and south in Pennsylvania, West Virginia, Kentucky and adjoining states. The rates are group rates from each mining district; all mines within a single district enjoying the same rate to a given destination. As found by the court below, prior to August 1, 1932, there was maintained what it described as " a finely balanced and nicely adjusted schedule of interstate and intrastate rates on bituminous coal from western Pennsylvania, northern West Virginia, and Ohio coal mining districts, to northeastern Ohio, with fixed differentials which have been regarded as essentially reasonable in view of all the elements which must be considered in rate making." These differentials had been maintained long prior to the year 1932; the rates being based upon that from the Pittsburgh district to Youngstown. With that rate fixed those from more remote producing districts, such as Connellsville, immediately south of the Pittsburgh district, and Fairmont, south of Connellsville, in northern West Virginia, were made by adding a differential; and rates to Cleveland and other more distant destinations also by adding a differential.

In 1932 the Ohio Commission ordered a reduction in the rates from two Ohio producing districts (Middle-Massillon and Ohio No. 8) to Canton and to Massillon.

Thereafter the Wheeling & Lake Erie Railway sought and obtained permission to extend the reductions to other destinations. The result was lowered scales to important coal consuming points such as Cleveland and Lorain. The New York Central, the Pennsylvania, the Baltimore & Ohio, and the Pittsburgh & West Virginia, as well as the Wheeling & Lake Erie, serve the Ohio producing territory. They resisted the proposed reductions of the Wheeling & Lake Erie, but without success. In order to meet competition, they reduced the rates between No. 8 District in Ohio and northeastern Ohio destinations. Thereafter, in order to preserve rate relationships, the Ohio Commission compelled reductions from mines in the Cambridge, Hocking and Pomeroy districts. Thus, by November 1, 1932, all of the intrastate rates between origins in Ohio and destinations in the territory above mentioned had been substantially lowered. This threw out of relation the interstate rates from the Freeport, Pittsburgh, Connellsville and Fairmont districts.

Several proceedings before the Interstate Commerce Commission resulted. In September and October, 1932, twelve carriers serving the Ohio districts and other origin territory in Pennsylvania, Maryland and nearby states, complained that the reductions gave an undue advantage and preference to persons and localities in Ohio to the prejudice of persons and localities outside the State, and charged also unreasonable and unjust discrimination against, and undue burden upon, interstate commerce. The Commission ordered an investigation, and named as respondents all railroads operating in Ohio subject to its jurisdiction. Subsequently four complaints were filed on behalf of operators of mines in Pennsylvania, Maryland and West Virginia. These alleged that the reduced Ohio rates in their relation to interstate rates were unduly preferential of Ohio shippers and localities, and unduly prejudicial to interstate shippers and localities, and un-

justly discriminated against interstate commerce. Three
of the complaints asserted that the interstate rates to
northeastern Ohio from mines in the Pittsburgh, Freeport,
Connellsville, and Fairmont districts were unreasonable
and in violation of § 1 of the Interstate Commerce Act.
After the Ohio rates were reduced the P. & W. Va. Rail-
road lowered its rates from the Pittsburgh district. The
Commission suspended these rates, but by a subsequent
order permitted their continuance subject to further in-
vestigation. The Complaint cases and the Investigation
and Suspension case against the P. & W. Va. Railroad
were consolidated with the 13th section investigation and
heard upon a single record.

The Commission found that northeastern Ohio is served
principally by the Pennsylvania, New York Central, Bal-
timore & Ohio, Wheeling, and Nickle Plate-Erie system;
that all of these carriers participate in the rates and trans-
portation of bituminous coal from the Ohio mines and
mines in Pennsylvania, West Virginia, and other states,
to the same destination, and that there is a large move-
ment of coal from the Ohio, Pennsylvania and West Vir-
ginia mines to northeastern Ohio. From the record it
concluded that coal is transported from the Ohio mines
to the destinations in question " at intrastate rates which
are generally substantially lower, distance considered,
than are the reasonable interstate rates herein provided,
under which such coal is moved to such destinations from
Pennsylvania and West Virginia"; and that "this dis-
parity in rates is greater than is warranted by differences
in transportation conditions from the Ohio mines on the
one hand and the Pennsylvania and West Virginia mines
on the other."

There was evidence in substantial volume bearing upon
the issue of the reasonableness of the existing interstate
rates from the Freeport, Pittsburgh, Connellsville and
Fairmont districts to the destination territory involved.

Much evidence was adduced as to rates approved by the Commission in other proceedings for approximately similar hauls, under similar transportation conditions. The Wheeling & Lake Erie introduced a cost study, and the State and other parties produced evidence as to coal rates in Illinois, fixed by the Commission, and a comparison of the conditions in that territory and those found in Ohio, all for the purpose of demonstrating that the reduced Ohio rates were maximum reasonable rates. There was evidence in opposition to this contention. The testimony showed that coal had moved freely from all producing areas, intrastate and interstate, under the old rates, and tended to prove that the unbalancement of the relation between the state and interstate rates had retarded and prohibited the shipment of a large quantity of coal from the other states to northeastern Ohio. The Commission in its report discusses this evidence in detail, and based upon it, makes findings to the effect that the interstate rates from the Freeport, Pittsburgh, Connellsville and Fairmont districts are reasonable; the system of differentials between the nearer state origins and the more remote interstate origins is proper, distance and other conditions considered; the reduced state rates are unduly preferential of persons and localities in Ohio and unduly prejudicial to persons and localities in the Freeport, Pittsburgh, Connellsville and Fairmont districts; and in order to remove the undue discrimination between persons and localities the intrastate rates should be increased to the former level, and the preëxisting interrelationships reëstablished.

■ The assertion that appellants were denied a fair hearing rests not upon any refusal to receive evidence tendered, but upon the Commission's alleged misconception of the rules as to burden of proof. It is said that from the outset the Commission acted upon a presumption that the reduced Ohio rates were unlawful and cast

on the appellants the burden of overcoming it by a preponderance of proof impossible of production. This complaint is founded upon a portion of the opening sentence of the report and two sentences near its close and by an analysis of the remainder of the report intended to show that the Commission gave too little weight to appellants' evidence and too much to that in opposition. On examination of the record, the report and the findings, we are satisfied there is no adequate foundation for the contention. The excerpts from the report which are cited, when read in their context, indicate only that the Commission intended fairly to inquire with respect to the lawfulness of the attacked rates and, after evaluating all the proofs on both sides, concluded that the preponderance was heavily against the appellants. The hearing was fair.

■ Untenable, also, is the position that there was no sufficient evidence to support the finding of preference and prejudice. We agree with the District Court that the proof of discrimination against interstate shippers and localities was convincing. Upon the issue whether the preference and prejudice was undue,—that is, whether the interstate rates were reasonable, whether the attacked intrastate rates were reasonable maxima, and what the proper relationship between the two scales should be,—a large amount of evidence was taken and considered in detail. There was ample support for each of the findings. In effect, we are asked to reëxamine the evidence, appraise it, and hold the Commission erred in its judgment as to the facts. We have often said that we have no such power.

■ The claim is that the Commission exceeded its authority in requiring state rates to be raised without having found or made reasonable all substantially competitive interstate rates. This contention requires the statement of certain matters in addition to those above recited. As we have seen, the coal which reaches north-

eastern Ohio comes from mines within and without the State. Those within Ohio are grouped in eight origin districts lying in the eastern and southern portions of the State. Those without Ohio lie in two rough arcs known as the inner and outer crescents. The inner includes the Pittsburgh district in western Pennsylvania contiguous to the Ohio River, the Connellsville immediately to the south, the Fairmont to the south of that, and eleven others to the southwestward through northern West Virginia, eastern Kentucky and Tennessee. The outer crescent is composed of districts extending in a wider arc eastward and southward of the inner crescent from the Altoona in Pennsylvania at the northeastern extremity to the Rathburn in southern Tennessee at the southwestern extremity.[2]

The mines in each district enjoy the same rate to a single destination, but the rates from the more remote districts are higher than those from the Ohio districts and from the more northerly districts in the inner crescent. In the proceedings before the Commission the only attack upon the reasonableness of interstate rates was leveled at those from the Pittsburgh, Connellsville and Fairmont regions. The complainants did not plead or offer proof that the rates from the more southerly districts in the inner crescent, or from those in the outer crescent, were unreasonably high. Nor did the appellants, who were respondents before the Commission, assert or attempt to prove that they were too low. These rates were put in evidence by the appellants, but only for the purpose of showing, by comparison of the ton-mile earnings under them, that the reduced Ohio rates were reasonable maxima.

---

[2] A map showing the area and location of the Ohio districts and most of those in the inner and outer crescents will be found in 46 I.C.C. opposite page 158.

The argument is that by confining its investigation of the reasonableness of the interstate rates to those from the Freeport, Pittsburgh, Connellsville and Fairmont origins and neglecting to investigate the reasonableness of those from the inner and outer crescents generally, the Commission exposed intrastate commerce to unjust discrimination in relation to competitive interstate commerce originating in the inner and outer crescents. Support for the argument is drawn from the assertion first, that the existing interstate rates from the crescents are lower than those from the Ohio mines, and secondly, that the entire crescent adjustment has always been made and regulated so as to represent a reasonable average level, and therefore any consideration of the Ohio rates should rest upon a comparison of the average reasonableness of the entire interstate adjustment.

The appellants fail to call attention to anything in the record which supports either of these statements, and we have been unable to find anything of the sort. The fact is that the rates from the southern inner and from the outer crescent territory are much higher than those from Ohio mines, and considerably in excess of those from the Freeport, Pittsburgh, Connellsville and Fairmont districts. It is undoubtedly true that the former show lower earnings per ton-mile than the latter. This, however, is in entire accord with the theory of rate making, namely, that the longer haul may be expected to yield a lower ton-mile return. But entirely apart from this, the record not only does not disclose that the entire adjustment of interstate rates from the Appalachian district is upon an average basis, but shows the contrary. Coal moves from Ohio origins and from both the crescents to destinations in territory other than the destination area here involved. Rates upon these movements have been the subject of repeated investigations by the Commission. Examination of the record and of the various proceedings with

respect to these interstate rate adjustments discloses that there are four major adjustments on northwestward-bound coal from Ohio and the crescents. One is the lake cargo adjustment, applicable on coal moving to lower Lake Erie ports for transshipment by water. The rate from any origin district is the same to all ports to which rates are published, but there are differentials in favor of Ohio origins and against inner and outer crescent districts.[3] A second embraces rates to northwestern Ohio, northeastern Indiana, and the southern peninsula of Michigan. The third is to territory west of that just mentioned, in which Chicago is a typical destination point. To the destination territory covered by the last mentioned areas the adjustments are similar, though the differentials from various points of origin are not the same. Five of the Ohio districts—No. 8, Cambridge, Hocking, Pomeroy, and Jackson—have the same rate to any given destination; the other Ohio districts take differentials under the rates from the former. All inner crescent districts have the same rate to a given destination. It is 50¢ over the Hocking rate to a destination in the first mentioned territory, and 35¢ over the Hocking rate to Chicago. The outer crescent has differentially higher rates than those applicable to the inner. The base rate for these two adjustments is the rate from Hocking to Toledo.[4]

The fourth adjustment is that to northeastern Ohio. It differs from the three previously mentioned. On shipments from Crooksville, Pomeroy and Hocking in Ohio, and from Kanawha and other southern inner crescent districts, northeastern Ohio prior to August 1, 1932, was included in the Toledo group, Cleveland taking the same rate as Toledo from those Ohio districts, and a rate 50¢

---

[3] See Lake Cargo Coal Cases, 1930, 181 I.C.C. 37.
[4] Compare Bituminous Coal to C. F. A. Territory, 46 I.C.C. 66; Ohio-Michigan Coal Cases, 80 I.C.C. 663.

higher from the named inner crescent districts. On the other hand, from Middle, Massillon, No. 8 and Cambridge in Ohio, and from Freeport, Pittsburgh, Connellsville and Fairmont in the northern part of the inner crescent, the adjustment was quite distinct. The base for these rates was not the Hocking-Toledo rate, but the Pittsburgh-Youngstown, or Pittsburgh-Cleveland rate. The rate from Ohio district No. 8 to Cleveland was 10¢ under the Pittsburgh-Cleveland rate. The rate from Connellsville is 9¢, and from Fairmont 15¢, over the Pittsburgh-Cleveland rate. The more southerly Ohio districts have always had a rate differentially higher than No. 8. Thus it appears that the adjustment from the crescent districts has not been, as appellant asserts, based on an average principle or average rates of all origin territory shipping coal to northeastern Ohio.

The appellant's argument, then, comes to this: That if a commodity is shipped in large quantities in interstate commerce from certain districts without Ohio to a destination in that state, and if it happens that the commodity also reaches the same destination from wholly different regions whose rates have been built upon a different key rate, the Commission cannot abate a discrimination between the first named group of rates, found to be reasonable, and the intrastate rates, without first finding that the rate from every other region to the same destination in Ohio is reasonable. To state the proposition is to answer it. The Commission has found the interstate rates from Freeport, Pittsburgh, Connellsville and Fairmont districts to northeastern Ohio destinations are reasonable. It cannot remove a preference and prejudice due to the reduction of the Ohio intrastate rate, so the argument runs, unless it finds also that the rate from a district in eastern Tennessee, close to the Alabama border, to the same destination, is also reasonable. Where rates are uniform from a group of origins to a given destination it

is necessary for the Commission to find that the rates from the group as a whole are reasonable, before it can raise the intrastate rates. Compare *Georgia Public Service Comm'n* v. *United States,* 283 U.S. 765; State Corporation Comm'n *v.* Aberdeen & Rockfish R. Co., 136 I.C.C. 173. But it by no means follows that that body, before it can remove discrimination against the district of origin whose rates are under consideration, must find or make reasonable rates adjusted to a different base rate and applying from districts lying in comparatively distant areas.

The Commission has found that the interstate rates from four districts of origin are reasonable. It has found that Ohio intrastate rates, the transportation conditions being similar, are, distance considered, out of relation to these interstate rates, so as to create undue preference and prejudice. These findings, supported by evidence, fully justified the order with respect to the intrastate rates under § 13 of the Act. Compare *Louisiana Commission* v. *Texas & N. O. R. Co.,* 284 U.S. 125.

*No. 868, Judgment affirmed.*
*No. 886, Appeal dismissed.*